Katrina R. STEWART, Respondent–
Below, Appellant,

v.

DEPARTMENT OF SERVICES FOR
CHILDREN, YOUTH, AND THEIR
FAMILIES, Petitioner–Below, Appel-
lee.

Jennifer Stuart, Respondent–
Below, Appellant,

v.

Department of Services for Children,
Youth, and their Families, Peti-
tioner–Below, Appellee.

Rhonda Stevens, Respondent–
Below Appellant,

v.

Department of Services for Children,
Youth, and their Families, Peti-
tioner–Below, Appellee.

Nos. 115, 2009, 151, 2009, 146, 2009.

Supreme Court of Delaware.

Submitted: Feb. 17, 2010.
Decided: March 16, 2010.
Reargument Denied April 13, 2010.

Andrew W. Gonser, Esquire, of Gonser and Gonser, P.A., Wilmington, Delaware, for appellant, Katrina R. Stewart.

Jennifer Stuart, pro se.

Rhonda Stevens, pro se.

Anthony U. Longo, Esquire, of the Department of Justice, Wilmington, Delaware, for appellee.

David C. McBride, Esquire and Emily Burton, Esquire, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Guardian Ad Litem for the Minor Children, appellees.

Before STEELE, Chief Justice, JACOBS, and RIDGELY, Justices.

RIDGELY, Justice.

This is a consolidated appeal from a Family Court order terminating Katrina R. Stewart's[1] ("Mother") parental rights and denying Mother's Aunt, Jennifer Stuart ("Stuart"), and Mother's mother's, Rhonda Stevens ("Stevens"), respective petitions for guardianship of Stewart's children (the "children"). Stewart makes two arguments on appeal. First, she claims that the Family Court erred when it held that the evidence presented by two qualified psychiatrists proved by clear and convincing evidence that Stewart is mentally incompetent and unable to discharge her parental responsibilities. Second, she contends that the Family Court erred when it terminated Stewart's parental rights because there was no showing by clear and convincing evidence that the Department of Services for Children, Youth and their Families ("DFS") met its obligation to create a meaningful case plan tailored to Stewart's mental disabilities. Stuart and Stevens appeal from the Family Court's denial of their petition for guardianship. We find no merit to the appeals and affirm.

### Facts and Procedural History

Ra'Shaun Stewart was born on September 12, 2005, and Ny'Aire Stewart was born on January 21, 2004 (collectively, "the children"). In November of 2005, DFS received information concerning the malnutrition of Ra'Shaun and the neglect of Ny'Aire. Allegedly, Mother was responsible and had been diluting Ra'Shaun's formula. As a result of DFS' investigation, Ra'Shaun was admitted to a hospital and diagnosed with non-organic failure to thrive. Although the exact cause of non-organic failure to thrive is unknown, psychological, social or economic problems within a family almost always play a role. Ra'Shaun was determined to be in the lowest 5th percentile for weight and remained in the hospital for five days. Ny'Aire was behind in her immunizations. Both were found dependent and placed in DFS care.

At a Preliminary Protective Hearing on December 16, 2005, Mother suffered a psychotic break and was admitted to Meadow Wood Behavior Center, a private psychiatric hospital. Eventually, Mother was discharged with a diagnosis of "psychosis not otherwise specified." DFS referred Mother to Dr. Joseph Nadel for a psychological evaluation, which occurred on February 24, 2006, and March 10, 2006. Dr. Nadel expressed concerns about Mother's ability to care for her children without supervision, and recommended that she receive a psychiatric evaluation to further explore her psychosis.

Mother entered into a Family Service Plan for reunification with DFS on March 14, 2006. Mother's case plan addressed:

---

**1.** The Court assigned pseudonyms to the parties pursuant to Supreme Court Rule 7(d).

obtaining employment, learning parental skills, taking the children to the doctor, learning to develop options and make appropriate decisions, and stabilizing her mental health. When this case plan was developed, DFS believed that Mother suffered from mental illness. Later, it was determined that Mother also suffered from mental incapacity. Upon this determination, no changes were made to the goals of the case plan itself. Bernadette DeAngelis ("DeAngelis"), a DFS Family Crisis Therapist, developed the case plan for Mother and worked directly with her. Christine Hermes ("Hermes"), a parent aide who worked with Mother, recognized Mother's limited intellect early on but never formally suggested adjustments to the case plan. Mr. Charles Chaney ("Chaney"), Mother's mental health nurse practitioner, also did not recommend changes to Mother's case plan. Instead, DFS adjusted the assistance it provided according to Mother's perceived needs.

DFS referred Mother to the Division of Vocational Rehabilitation ("DVR") because Mother did not appear to have any work history or employment skills. Mother received these services from June 19, 2006 through July 19, 2006. Ms. Stephanie Ziegenhorn, a DVR employee, testified that Mother appeared unmotivated—she arrived late, left early, failed to stay on task or be consistently productive. Consequently, Mother was unsuccessfully discharged. Mother was then referred to Delaware's Division of Developmental Disability Services ("DDDS"). Mother's parent aide assisted her with searching for jobs and filling out job applications. Mother applied for, and currently receives, Supplemental Security Income ("SSI"). As of the date of the Termination of Parental Rights hearing, Mother was working with DDDS, but manifesting problems with punctuality and failing to appear for scheduled meetings and work shifts.

When DFS became involved with Mother, she was not receiving mental health treatment services or medication. Mother was diagnosed with "major depression with psychosis", prescribed medication, and scheduled for monthly appointments. Additionally, DFS provided Mother with bus passes. Mother never asked DFS for assistance with transportation to get to Connections or to a pharmacy to have her prescriptions filled. Although Mother testified that she was taking medication as of July 9, 2008, her last visit with the nurse practitioner was in April of 2008.

Mother was also referred to a parenting class and assigned a parent aide to assist Mother with acquiring basic parenting skills. Mother was expected to learn how to feed and clothe the children, and interact with them in a meaningful manner. Hermes, Mother's parent aide, testified that Children and Families First worked with Mother for approximately ten months, a longer amount of time than normal. Ultimately, Mother was unsuccessfully discharged from the program. DeAngelis estimated that Mother spent approximately 25 percent of each visit interacting with the children; the children would play by themselves for the remainder of the time. DeAngelis and Hermes testified that Mother required prompting and encouragement to interact with the children, feed them and change diapers. Mother failed to understand Hermes and DeAngelis' concerns regarding her interactions with the children.

Mother last visited the children on August 27, 2007. Present were Mother, Stevens, Stuart and the children. Mother attempted to have Ny'Aire try on clothing and became agitated when Ny'Aire refused. DFS employees interceded several times to de-escalate the situation. Mother became physically aggressive with Ny'Aire

and threw her on the couch. At that point, DFS removed the children and terminated the visit. Mother, Stevens and Stuart became upset and yelled at the DFS social workers. The Family Court subsequently suspended the entire family's visitation with the children. Visitation was not reinstated.

To determine whether Mother was competent to parent the children, she was evaluated by Drs. John A. DeFrate and David E. Raskin.[2] Dr. DeFrate met with Mother on January 26, 2007, and May 29, 2008. He also reviewed evaluations of Mother issued by psychologist Dr. Joseph Nadel, psychiatrist Dr. Kurtz and Meadow Wood Hospital records. Dr. DeFrate also spoke with DeAngelis, reviewed reports from Mother's parent aides and spoke with Chaney. Dr. DeFrate diagnosed Mother with "schizoaffective disorder," and opined that she had a limited intellectual capacity. Dr. DeFrate also testified that the ordinary course of treatment for that condition included medication and that failure to comply with medication could result in increased paranoia, disorganized thoughts, difficulty processing information and increased episodes of agitation and depression. As of January 26, 2007, Dr. DeFrate held the opinion that Mother would not be capable of successfully and safely providing care for her children without supervision due to serious lapses in judgment and her failure to see the significance of her limitations. Dr. DeFrate categorized her mental health status as chronic and unlikely to improve significantly.

Dr. DeFrate referred to two separate admissions of Mother to Meadow Wood, one of which required Mother to be physically restrained to prevent injury to herself and others. Dr. DeFrate noted that Mother had symptoms of psychosis, including paranoia, and was appearing to respond to auditory/visual hallucinations. During her second interview with Dr. DeFrate, Mother stated that she received her psychiatric treatment with Chaney on a regular basis. In fact, she had not been compliant with either her monthly appointments or medication. Dr. DeFrate also noted that Mother's mental status vacillated between periods of stability and instability, and testified that Mother would be unable to discharge her parental responsibilities due to mental incompetence. Dr. DeFrate specifically noted that Mother did not see the seriousness of her child's medical issues despite the fact that he had been hospitalized.

Dr. Raskin conducted his evaluations of Mother in May of 2007 and June of 2008. Dr. Raskin reviewed the reports of Dr. DeFrate, the records of Chaney, records from Meadow Wood, an evaluation by Dr. Nadel, and the records of Mother's parent aids. Dr. Raskin also verified Mother's current psychiatric care compliance with Chaney the day before his testimony and also spoke with DeAngelis, Mother's social worker.

Dr. Raskin testified that he did not observe during the first interview any clear evidence of psychiatric impairment on Mother's part and that during the second interview there were "no overt signs of positive psychiatric illness." Ultimately, however, Dr. Raskin determined that Mother exhibited problems with making appointments and following through on tasks. Dr. Raskin also noted that Mother was delusional, and that Mother's mental concerns were two-fold—psychiatric symptoms and intellectual problems. Dr. Raskin stated that Mother lacked insight into her mental health, that her diagnosed intellectual and psychotic issues affected her ability to function, that Mother's lack of

**2.** Pursuant to 11 *Del. C.* § 1103(a)(3).

insight resulted in her non-compliance with medication, and that such non-compliance could lead to a very high probability of increased problems. Dr. Raskin testified that even if Mother complied with her medication, she would likely still have very concerning psychiatric symptoms.

Mother also falsely stated to Dr. Raskin that she was taking her medication as prescribed. Dr. Raskin believed that Mother's probability of future acute episodes was very high. In reviewing the records of Mother's parent aides, he noted observations consistent with his opinion that Mother's disorganized thinking and psychotic symptoms directly affected her ability to stay on task and perform basic parenting skills.[3]

Dr. Raskin also opined on the effect of Mother's mental health concerns on her work abilities. He stated that Mother's inability to focus, appear on time for work, stay on task and complete assignments was symptomatic of her diagnosis. Dr. Raskin concluded with a reasonable degree of medical/psychiatric certainty that Mother would be unable to discharge her parental responsibilities in the foreseeable future, due to mental incompetence.

The Family Court found that the evidence presented by Dr. DeFrate and Dr. Raskin was clear and convincing proof that Mother was mentally incompetent and unable to discharge her parental responsibilities in the foreseeable future.[4] The testimony of Dr. DeFrate and Dr. Raskin was not refuted by independent evidence presented by Mother. The Family Court concluded that DFS made appropriate reunification services available to Mother, but Mother was not able to comply due to her mental illness. Further, the Family Court held that Mother's failure to plan for the care of the children provided an alternate ground for the termination of her parental rights. Finally, the Family Court determined that termination of parental rights was in the children's best interest. The Family Court also denied the guardianship petitions of Rhonda Stevens and Jennifer Stuart. Mother, Stevens and Stuart filed appeals which have been consolidated.

### Analysis

■ When reviewing the Family Court's termination of parental rights, our standard and scope of review involves a review of the facts and law, as well as the inferences and deductions made by the trial court.[5] To the extent that the issues on appeal implicate rulings of law, we conduct a de novo review.[6] To the extent that the issues on appeal implicate rulings of fact, we conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly wrong.[7] This Court will not disturb inferences and deductions that are supported by the record and that are the product of an orderly and logical deductive process.[8] If the trial

---

3. Specifically, Dr. Raskin noted that Mother was late to nearly every visit with her children, she did not understand the importance of appointments, she needed constant reminders to change diapers and feed the children, she required prompting to interact/play with the children, and she was paranoid.

4. See 13 Del. C. § 1103(a)(5).

5. Powell v. Dep't of Serv. for Children, Youth, & Their Families, 963 A.2d 724, 730 (Del. 2008); Solis v. Tea, 468 A.2d 1276, 1279 (Del.1983).

6. Powell, 963 A.2d at 730–31; In re Heller, 669 A.2d 25, 29 (Del.1995); Black v. Gray, 540 A.2d 431 (Del.1988).

7. Powell, 963 A.2d at 731; In re Stevens, 652 A.2d 18, 23 (Del.1995).

8. Powell, 963 A.2d at 731; In re Stevens, 652 A.2d at 23; Solis, 468 A.2d at 1279.

court has correctly applied the law, our review is limited to abuse of discretion.[9]

**The Family Court did not abuse its discretion in finding the expert testimony of two the court-appointed psychiatrists proved, by clear and convincing evidence, that Mother was mentally incompetent.**

■ Mental incompetence is a statutory ground for termination of parental rights whenever it appears to be in a child's best interest.[10] Mother contends that the Family Court erred in finding her mentally incompetent. A finding of mental incompetence is appropriate when the evidence from two qualified psychiatrists selected by the Family Court indicates the individual is "unable to discharge parental responsibilities in the foreseeable future...."[11] "Mental incompetence" also has been defined by Delaware case law to mean a deficiency rendering one "unable to comprehend or transact the ordinary affairs of life."[12] Mother argues that both psychiatrists "must provide evidence and that evidence from only one psychiatrist is insufficient." Specifically, Mother challenges the "independent nature" of Dr. Raskin's and Dr. DeFrate's opinions. Ultimately, Mother argues that the evidence presented does not establish by clear and convincing evidence that she is unable to discharge her parental responsibilities.

Mother relies upon Dr. Raskin's opinion that Mother "did fairly well" in the interviews he had with her. Mother contends that Dr. Raskin did not provide "direct evidence" that Mother was unable to discharge her parental responsibilities or independently evaluate her ability to do so, relying instead on the "opinions of others."

Mother also points to the fact that Dr. Raskin never inquired of Mother about her plan for the children's care or education, and that he acknowledged Mother loved the children. Mother argues that Dr. Raskin's use of Dr. DeFrate's report in forming his conclusion about her ability to discharge her parental responsibilities was improper "piggybacking." Mother also points out that in his initial report, Dr. Raskin's findings did not track the statutory language that Mother would be unable to "discharge her parental responsibilities." Rather, Dr. Raskin said that he "[could not] recommend that [Mother] be given custody." Mother argues that this language raises a "serious question" as to the independent nature of Dr. Raskin's conclusion that Mother was unable to discharge her parental responsibilities, given Dr. Raskin's admission that counsel for DFS provided the statutory language for him between his first and second evaluation of Mother.

Mother argues that some of Dr. DeFrate's findings undercut the Family Court's conclusion that she is unable to discharge her parental responsibilities. Specifically, Mother has her own apartment, she is in a job training program, and she lives on $637 per month of SSI and food stamps. Dr. DeFrate also did not question Mother regarding her plan to provide for the education of the children, but did acknowledge that Mother loves the children and desires placement. Mother argues that Dr. DeFrate's evaluation may not have been entirely independent because he has been previously employed by DFS to evaluate a parent's ability to discharge his or her parental responsibilities,

---

9. *Powell,* 963 A.2d at 731; *Solis,* 468 A.2d at 1279.

10. 13 *Del. C* § 1103(a)(3).

11. *Id.*

12. *Sheridan v. Sheridan,* 1997 WL 525867, at *5 (Del.Ch. July 2, 1997).

and each time he found that the parent was unable to do so.

In arriving at his conclusion, Dr. DeFrate relied on evaluations conducted by Dr. Nadel and psychiatrist Dr. Kurtz, Meadow Wood records, reports from the parent aid, and information from Mr. Chaney. Dr. DeFrate diagnosed Mother with "schizoaffective disorder" and opined that she had a limited intellectual capacity. Dr. DeFrate testified that the ordinary course of treatment for her disorder included medication, and that failure to adhere to the treatment could result in increased symptoms such as paranoia, disorganized thoughts, agitation, depression and difficulty processing information. Dr. DeFrate testified that he does not believe that Mother is capable of successfully and safely providing care for her children without supervision.

In support of his opinion, Dr. Raskin personally evaluated Mother in May of 2007 and June of 2008. Further, he relied on evaluations conducted by Dr. DeFrate, Chaney, and Dr. Nadel. Dr. Raskin also reviewed records from Meadow Wood, Mother's parent aides, and DeAngelis, Mother's social worker. Dr. Raskin opined that Mother exhibited problems thinking in a goal-directed and consistent manner, and suffered from delusions. Dr. Raskin explained that Mother lacked insight into the impact of her psychiatric symptoms and intellectual problems on her ability to function. Dr. Raskin noted that Mother manifested a tendency to be non-compliant with medication. Dr. Raskin opined that even if Mother complied with her medication, she could still have very concerning psychiatric symptoms. Dr. Raskin also took note of observations made by parent aides that were consistent with his opinion that Mother's disorganized thinking and psychotic symptoms directly affected her. Specifically, the aides observed she was late to nearly every visit with her children, did not understand the importance of appointments, needed constant reminders to change diapers and feed the children, required prompting to interact with the children, and was paranoid. Finally, Dr. Raskin testified with a reasonable degree of psychiatric certainty that Mother would be unable to discharge her parental responsibilities in the foreseeable future because of her mental incompetence.

The Family Court found that the expert testimony of Drs. DeFrate and Raskin was not refuted. Both doctors based their expert opinions on two separate evaluations of Mother, their respective review of Mother's treatment and evaluations with other psychiatrists and psychologists, Mother's Meadow Wood records, parent aide records, social worker reports and records of Mother's treating nurse practitioner. Both experts testified that reviewing the records of others was a valid psychiatric procedure and a normal method used to make assessments.

Though Dr. Raskin did not note any clear evidence of impairment during the interviews themselves, he explained that this did not effect his ultimate conclusion that Mother was unable to discharge her parental responsibilities. He explained that a person can perform well during an interview without exhibiting obvious signs of problems in thinking.

■ Mother's argument, that it was improper for Dr. Raskin to rely on the opinions of others and to use Dr. DeFrate's report to form his own opinion, is without merit. The Delaware Uniform Rules of Evidence and case law provide that an expert's opinion may be based on inadmissible evidence as long as it is of the type reasonably relied upon by experts in that

field in forming opinions.[13] It is also settled that an expert witness may rely upon the records of another expert in formulating his own opinion.[14]

Given the testimony provided by the expert witnesses and the manner in which they came to those opinions, the Family Court did not abuse its discretion by holding that DFS proved, by clear and convincing evidence, that Mother is mentally incompetent and unable to discharge her parental responsibilities, and that termination of parental rights was in the children's best interest.

### DFS made reasonable efforts to reunite the family.

■ Mother next claims that DFS did not meet its obligation to create a meaningful case plan tailored to Mother's mental disabilities, or to make all reasonable efforts to reunify Mother and her children. The Family Court held that an alternate basis for terminating Mother's parental rights was her failure to plan pursuant to 13 *Del. C.* § 1103(a)(5). When seeking termination of parental rights based on a failure to plan, DFS must prove by clear and convincing evidence "that DFS made *bona fide* reasonable efforts to reunite the family."[15] Noting that the Family Court judge suggested that Mother could appeal the Family Court decision, Mother argues that DFS did not make sufficiently reasonable efforts, relying on a dissenting opinion

in an unpublished Arizona case, *Victoria W. v. Arizona Department of Economic Security*.[16] In that case, the dissent argued that "when a parent has an immutable mental capacity, severing the constitutionally protected parental relationship is unjustified without a finding that the parent cannot adequately meet the child's needs with appropriate assistance."[17] The same judge, dissenting in another Arizona case,[18] suggested placement of both the mother and the child in a supervised, group residential setting.

■ The dissent in *Victoria* also argued that "the reunification services cannot be determined to be futile simply because a mental capacity is immutable."[19] Mother also points to decisions in other jurisdictions holding that what constitutes "reasonable efforts" depends on the needs of the parent. The Rhode Island Supreme Court has held that "[t]he issue of the reasonableness of the department's efforts must be determined from the 'particular facts and circumstances of each case.'"[20] The State is also required to make reasonable efforts "[r]egardless of the unlikelihood for success."[21] The Rhode Island Supreme Court stated that for parents with mild mental incapacity, "the efforts required from DCYF to satisfy the reasonable efforts standard 'vary with the differing capacities of the parents involved.'"[22]

---

13. D.R.E. 703.

14. *Michaels v. Gregory*, 2007 WL 2702811 (Del. Sept. 18, 2007).

15. *In re Hanks*, 553 A.2d 1171, 1179 (Del. 1989).

16. 2007 WL 5506270 (Ariz.Ct.App.Div. Aug. 21, 2007).

17. *Id.*, at *7.

18. *See Vanessa H. v. Arizona Department of Security*, 215 Ariz. 252, 159 P.3d 562 (Ct.App. 2007).

19. *Victoria W.*, 2007 WL 5506270, at *7.

20. *In re Joseph S.*, 788 A.2d 475, 478 (R.I. 2002) (quoting *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989)).

21. *In re Joseph S.*, 788 A.2d at 477.

22. *In re Christopher B.*, 823 A.2d 301, 308 (R.I.2003).

A California Appellate Court,[23] the Court of Appeals for the state of Washington,[24] and the Missouri Court of Appeals, Western District,[25] have made similar holdings. We agree that the reasonableness of the efforts by DFS to reunite the family must be determined from the particular facts of each case, including the capacities of the parents involved. We will review the efforts of DFS from that perspective.

The DFS case plan addressed the following areas: helping Mother to financially support herself and the children; choosing appropriate caregivers, should the children be placed back in Mother's care; having Mother attend any medical appointments for the children; helping Mother learn how to care for the children; requiring Mother to have a psychiatric evaluation and comply with recommendations for treatment; problem-solving and coping skills; and frequent and meaningful visitation with the children. Mother does not dispute that she failed to comply with the case plan, but instead argues that the case plan itself did not adequately consider her mental limitations.

As an initial matter, DeAngelis testified that the case plan took place over a two and a half year time period and involved several fine tuning adjustments based on Mother's condition. Mr. Chaney, who was involved in Mother's treatment, stated that further treatment would still involve medication to determine how well Mother could actually function if she complied. Mother might also be offered case management services. Mr. Chaney also testified, however, that these services are for people that have established some degree of compliance with the plan and understanding of their illness.

The record shows that DFS made significant efforts to assist Mother. DFS arranged for Mother to receive psychiatric treatment, to gain employment and parenting skills, helped her with job applications, a SSI application, and a DDDS application. DFS also provided Mother with a parenting program, a parent aide service for ten months, and bus passes to facilitate compliance with her case plan. The case plan reflected a concern for her limitations, but Mother's participation was sparse and it was that limited participation which resulted in the Family Court's conclusion that she had failed to plan. This is not a case where the State failed to meet its own obligation to provide appropriate services, but a case where the parent failed to take advantage of the services offered. On the record before us, we conclude that the Family Court did not err in concluding that DFS made appropriate reunification services available to Mother.

---

**23.** "[B]efore parental rights of a developmentally disabled parent can be properly terminated the record must establish by clear and convincing evidence that services specially designed to meet the needs of the developmentally disabled have been explored." *In re Victoria M.*, 207 Cal.App.3d 1317, 255 Cal. Rptr. 498 (1989). In that case, the court overturned the termination of parental rights of a mother because "no accommodation was made for [her] special needs in providing reunification services." *Id.* at 1329, 255 Cal. Rptr. 498.

**24.** *In re Dependency of H.W. & V.W.*, 92 Wash. App. 420, 961 P.2d 963, 969 (1998) (finding that if a mentally deficient mother is not afforded reunification services catering to her intellectual limitations, the Department of Social and Health Services cannot terminate her parental rights).

**25.** *In re S.P.W.*, 707 S.W.2d 814 (Mo.Ct.App. 1986) ("If, as charged in the second ground, Ms. Ward's mental condition made her incapable of forming an intent or acting knowingly, she could not be held responsible for having failed reasonably to comply with a court-approved plan or with being unsuccessful with such a plan.")

### The Family Court did not abuse its discretion in denying the guardianship petitions

The Family Court's consideration of an application for guardianship of children is governed by 13 Del. C. § 2330. To grant a guardianship petition, two factors must be shown by the preponderance of the evidence: 1) the child must be found dependent and/or neglected; and 2) it must be in the best interests of the child for guardianship to be granted.[26] To determine the best interests of the child, Section 722(a) provides a list of eight factors that the Family Court must considered.[27]

We have previously held that "[t]he statute anticipates that the Family Court will weigh the amalgam of all the listed best interest factors that favor one parent against the amalgam of factors that favor the opposing parent and all other relevant evidence and only then make an independent determination of the placement that will be in the best interest of the children."[28] Further, the Family Court must consider "each of the eight 'best interest' factors ..., none of which is solely determinative."[29]

### Stevens' petition for guardianship

■ The Family Court took note of several facts when weighing whether to grant Stevens' petition. The children were living with Stevens when DFS intervened.[30] Stevens had a history of problems with DFS.[31] Stevens took part in the disruptive visit that resulted in the termination of visitation rights with the children for Stevens, Stuart and Mother. Stevens testified that she had a criminal history.[32]

The Family Court applied the eight factors set forth in § 722(a). Under the first factor, Mother supported either guardianship petition if she could not regain custody of the children. The second factor was not gauged by the children's wishes, but

---

26. 13 Del. C. § 2330(a)(2).

27. Section 722(a) provides:

   1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;
   2) The wishes of the child as to his or her custodian(s) and residential arrangements;
   3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, person cohabitating in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;
   4) The child's adjustment to his or her home, school and community;
   5) The mental and physical health of all individuals involved;
   6) Past and present compliance by both parents with their rights and responsibilities of their child under § 701 of this title;
   7) Evidence of domestic violence as provided for in Chapter 7A of this title; and

   8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense.

28. *Russell v. Stevens*, 2007 WL 3215667, at *2 (Del. Nov. 1, 2007) (citations omitted).

29. *Id.* at *2. (citations omitted).

30. The Family Court found that the children were residing with Stevens immediately prior to Ra'Shaun's hospitalization and that Stevens acknowledged that Mother's son required medical attention, but did not seek it out for him.

31. Stevens testified that she refused to allow her own son to have brain surgery that resulted in her child being removed from her home and placed with her mother. Stevens' granddaughter had also made allegations of being hit by Stevens, which involved a subsequent DFS investigation.

32. She was previously convicted of harassment, offensive touching and resisting arrest.

by their conduct. Neither child had seen the guardianship petitioners in the prior eleven consecutive months. There was testimony that the children had bonded to their current caregiver who wished to adopt them, and that neither child had asked for or about either petitioner. Regarding the third factor, the family had a low amount of interaction with the children during their visitations and was involved in the altercation that resulted in the Family Court terminating visitation rights.

Regarding the fourth factor, testimony was presented that both children had transitioned well into their pre-adoptive placement and were thriving. The children had become attached to their foster mother and her extended family, had play dates with extended family, Ny'Aire had begun to take ballet classes, and the foster mother wished to adopt both children. As for the fifth factor, Stevens, although having no discernable mental or physical concerns, lacked insight regarding the physical concerns of her grandchildren and failed to act when it was necessary. As for the sixth factor, Stevens' son was removed from her home twice after DFS involvement. Regarding the seventh factor, the record does not reflect a history of domestic violence involving either petitioner. The eighth factor focuses on the criminal history of any party. Here, Stevens' criminal history included harassment, offensive touching and resisting arrest.

Stevens has not shown that the findings of fact are clearly wrong. The Family Court did not abuse its discretion when it denied Stevens' petition for guardianship.

### Stuart's petition for guardianship

■ In denying Stuart's petition for guardianship, the Family Court again applied the eight factors set forth by § 722(a) to the facts of this case. The Family Court's decision was supported by Stuart's mental health history and lack of financial resources.

Under the first of eight factors set forth by § 722(a), Mother supported either guardianship petition if she could not regain custody of the children. The second factor was gauged not by the children's wishes, but by their conduct. Neither child had seen the guardianship petitioners in the prior eleven consecutive months. There was testimony that the children had bonded to their current caregiver who wished to adopt them and that neither child had asked for or about either petitioner. As for the third factor, the petitioners had a low level of interaction with the children during their visitations. Regarding the fourth factor, the testimony was that both children had transitioned well into their pre-adoptive placement and were thriving. The children had become attached to their foster mother and her extended family, had play dates with extended family, Ny'Aire had begun to take ballet classes, and the foster mother wished to adopt both children.

The Family Court held that the fifth factor, concerning the mental and physical health of all interested parties, weighed against Stuart. Stuart was diagnosed with a mental incapacity and had a mental health history involving a "spiritual battle" for which she received mental health treatment and Social Security benefits. As for the sixth factor, which concerns the past and present compliance of a parent's rights and responsibilities to their children, the Family Court noted that Stuart had past charges involving failure or refusal to send her child to school. Regarding the seventh factor, the record does not reflect any history of domestic violence regarding either petitioner. Finally, as for the eighth factor, which concerns the criminal history

of any party, Stuart was found guilty of refusing to send her child to school, and could not recall the final resolution of a carry a concealed deadly weapon charge.

Stuart has not shown that the findings of fact are clearly wrong. The Family Court did not abuse its discretion when it denied Stuart's petition for guardianship.

## Conclusion

The judgments of the Family Court are **AFFIRMED.**