# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AMEENA BROWN and EVAN BRAGGS, Individually and as Co-Administrators of the Estate of A.B., deceased, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. N20C-01-067 PAW |
| FISHER-PRICE, INC. and MATTEL, INC. | ) ) ) | |
| Defendants. | ) ) | |

Submitted: November 8, 2024
Decided: December 20, 2024

## MEMORANDUM OPINION AND ORDER

*Upon Consideration of Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Dennis Rosen, M.D. Pursuant to D.R.E. 702;*

## DENIED, in part, and GRANTED, in part.

Robert J. Leoni, Esq., Shelsby & Leoni, PA, *Attorney for Plaintiffs.*

Jennifer C. Wasson, Esq., Carla M. Jones, Esq., and Ryan Kingshill, Esq., of Potter Anderson & Corroon LLP, *Attorneys for Defendants*.

**WINSTON, J.**

# I.  INTRODUCTION[1]

Defendants move to exclude the expert testimony of Dr. Dennis Rosen under Delaware Rule of Evidence 702.[2]  Plaintiffs seek to introduce Rosen's testimony to show the RnP places infants in an anatomically unsafe position.[3]  Rosen also intends to testify the RnP in the instant case allowed for an infant, A.B., to roll onto his side and press his face against the side of the RnP, ultimately resulting in A.B.'s death.[4]  Rosen's report also touches on the topic of rebreathing.[5]  Defendants contend: (1) Rosen lacks a scientifically reliable basis to offer any general or specific causation opinion; (2) Rosen's reliance on Mannen's report renders Rosen's opinion inadmissible; (3) Rosen's opinion as to A.B.'s cause of death "rests on Dr. Rosen's complete guesswork;" (4) Rosen utilized a flawed differential diagnosis methodology; and (5) Rosen based his opinion on a theory of increased risk that Pennsylvania law precludes.[6]

---

[1] This Memorandum Opinion and Order references the factual and procedural background outlined in the Court's Memorandum Opinion and Order upon Consideration of Defendants' Motion for Summary Judgment, which the Court incorporates by reference.  Unless otherwise noted, defined terms are ascribed the same meaning as in the Court's Summary Judgment Memorandum Opinion.

[2] Defs.' Mot. to Exclude Pls.' Expert Dennis Rosen, M.D., D.I. 177.

[3] Pls.' Opp'n to Defs.' Mot. to Exclude Dennis Rosen, M.D., D.I. 205.

[4] *Id*.

[5] D.I. 178 Pls. Ex. F at 8-10, 16-22 ("Dr. Rosen's Report"); Rosen's testimony regarding rebreathing is examined in a separate Memorandum Opinion and Order.

[6] D.I. 177.

## II.  STANDARD OF REVIEW

Delaware Rule of Evidence ("D.R.E.") 702 governs the admission of expert testimony.  Under D.R.E. 702, expert opinion testimony is admissible provided that the witness "is qualified as an expert by knowledge, skill, experience, training, or education" if:

> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of the fact to understand the evidence or to determine a fact in issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert has applied the principles and methods to the facts of the case.[7]

The burden falls on the party seeking to admit the expert testimony to show, by a preponderance of the evidence, its admissibility under D.R.E. 702.[8]  "Once expert testimony is challenged, the reviewing court must ensure that the proffered testimony is both relevant and reliable."[9]  To fulfill this duty, this Court acts as gatekeeper, determining if "the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be

---

[7] D.R.E. 702.

[8] *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 795 (Del. 2006).

[9] *Scottoline v. Women First, LLC*, 2023 WL 2325701 at *3 (Del. Super. Mar. 1, 2023) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).

applied to the facts in issue."[10]  In making that determination, the Court applies a

five-step test that examines whether:

> (1) the witness is qualified as an expert by knowledge, skill, experience, training[,] or education; (2) the evidence is relevant [and reliable]; (3) the expert's opinion is based upon information reasonably relied upon by experts in the particular field; (4) the expert will assist the trier of fact to understand the evidence or to determine a fact in issue; and (5) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[11]

For scientific evidence to be deemed reliable, the testimony must be rooted in

science and derived from the scientific method.[12]  Expert testimony is relevant when

it assists the trier of fact to understand the evidence or determining a fact in issue.

Thus, the core of a *Daubert* analysis is the "principles and methodology" used in

formulating an expert's testimony, not on the expert's resultant conclusions.[13]  This

Court possesses "broad latitude to determine whether any or all of the *Daubert*

---

[10] *Gen. Motors Corp. v. Grenier*, 981 A.2d 531, 536 (Del. 2009) (internal quotations omitted) (quoting *Daubert*, 509 U.S. at 592-93).

[11] *Norman v. All About Women, P.A.*, 193 A.3d 726, 729-30 (quoting *Smith v. Grief*, 2015 WL 128004 (Del. Jan. 8, 2015)).

[12] *Daubert*, 509 U.S. at 590-94.

[13] *Bowen*, 906 A.2d at 794 (citing *Daubert*, 509 U.S. at 595).

factors are reasonable measures of reliability in a particular case."[14] "A strong preference exists for admitting evidence that may assist the trier of fact."[15]

## III. ANALYSIS

Rosen devotes a material amount of his report to a more general overview of why inclined sleepers are unsafe according to the American Academy of Pediatrics (the "AAP").[16] He then utilized a differential diagnosis, ruling out other potential causes of death and concluding the RnP's design allowed A.B. to roll onto his side.[17] Rosen opines that once A.B. rolled to his side his face pressed against the side of the RnP, resulting in A.B.'s death.[18] Rosen based his opinion on his experience as a pediatric pulmonologist, his review of A.B.'s medical records, the witness

---

[14] *Grenier*, 981 A.2d at 536 (internal quotations omitted) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

[15] *Norman*, 193 A.3d at 730.

[16] Dr. Rosen's Report.

[17] *Id*. at 24-26.

[18] *Id*. at 26.

statements of A.B.'s mother and grandmother,[19] and several studies and publications cited throughout Rosen's opinion.[20]

### A. ROSEN QUALIFIES AS AN EXPERT IN PEDIATRIC PULMONOLOGY.[21]

Defendants assert Rosen lacks a sufficient background in biomechanics, particularly as applied to an inclined sleeper, and thus cannot offer a causation opinion that relies on biomechanics or engineering.[22] Defendants further note Rosen did not train as a forensic pathologist, focusing his practice on "sleep-disordered breathing in infants and children with underlying medical complexity."[23] As Rosen's opinion relies, at least in part, on an understanding of biomechanics and forensic

---

[19] At oral argument, Defendants contended that all Plaintiffs' expert opinions were factually flawed because they failed to correctly account for the position of A.B.'s face as described by his mother in her deposition. This assertion is incorrect. *See* Dr. Calhoun's Report at 6; Dr. Hoffman's Report at 6; Dr. Mannen's Report at 5; Dr. Rosen's Report at 6; Dr. Ross' Report at 4. Further, challenges to the factual basis of an expert opinion go to credibility, not admissibility. An expert's testimony will be excluded on the factual basis grounds only in the narrow circumstance where the expert has completely neglected the core facts of the case. *See Henlopen Hotels, Inc. v. United National Insurance Co.*, 2020 WL 233333 (Del. Super. Jan. 15, 2020). This is not the case here.

[20] *Id*. at 1-2.

[21] Defendants' arguments for excluding the testimony of Rosen are almost identical to their arguments for excluding Hoffman's testimony.

[22] D.I. 177 at 12.

[23] *Id*.

6

pathology, Defendants posit he lacks the requisite expertise to give such an opinion.[24]

A review of Rosen's report reveals he does rely upon biomechanical conclusions in constructing his opinion.[25] Biomechanics, however, make up just a portion of Rosen's report. Rosen also considers literature from the AAP,[26] the medical examiner's report,[27] a differential diagnosis,[28] and Rosen's own experience and training. Rosen's opinion does not rely primarily on biomechanical concepts. His reliance on biomechanical conclusions does not preclude him from qualifying as an expert in pediatric pulmonology, and his expertise as a pediatric pulmonologist forms the backbone of his opinion and conclusions.[29] Rosen's training, education, and experience qualify him as an expert on pediatric pulmonology and infant sleep disorders.

---

[24] *Id*. at 19.

[25] Dr. Rosen's Report at 19-21.

[26] *Id*. at 16.

[27] *Id*. at 22.

[28] *Id*. at 24-24.

[29] *See Lee v. Holbrook,* 2021 WL 5492666 at *3 (Del. Super. Nov. 22, 2021) (noting that a medical expert relied upon a biomedical expert's conclusions in forming his own expert opinion).

## B.    ROSEN MAY RELY ON MANNEN'S REPORT AND STUDIES TO SUPPORT HIS OPINION.

Rosen cites to several studies and reports, including the expert report prepared by Mannen.[30]   Defendants argue Rosen's reliance on Mannen's report renders Rosen's opinion inadmissible.  Specifically, they contend that Mannen's report: (1) should be inadmissible, (2) does not support Rosen's conclusion, and (3) lacks the requisite fit to be applicable to this case.[31]

Defendants filed a separate motion regarding the admissibility of Mannen's expert testimony, but the admissibility of her testimony does not materially affect the analysis of Rosen's opinion.[32]   Under D.R.E. 703, an expert may base their opinion on inadmissible evidence as long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject …"  Thus, the analysis must center on whether Mannen's reports and publications are the kind a pediatrician would reasonably rely upon.[33]

---

[30] Dr. Rosen's Report at 19-20.

[31] D.I. 177 at 15.

[32] This analysis is identical to the analysis in the Memorandum Opinion and Order discussing the admissibility of Hoffman's testimony.

[33] D.R.E. 703; *see also Norman*, 193 A.3d at 730.

8

Rosen primarily relies on Mannen's Biomechanical Engineering Report,[34] as well as two studies Mannen co-authored.[35] Defendants assert all of Mannen's work cited by Rosen cannot be applied to the facts of the instant case.[36] Defendants posit for any biomechanical study to be relevant to the facts of this case those studies must have been conducted with infants fully swaddled.[37]

D.R.E. 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." "[A]n expert's methodology must be not only reliable intrinsically but also be reliably applied to the facts of the specific case …"[38] Defendants characterize this concept as requiring any study relied upon by an expert to have occurred under near-identical circumstances to the facts of the instant case.[39] This contention is addressed in the Court's Memorandum Opinion and Order regarding the testimony of Mannen.

Defendants characterize Rosen's reliance on other expert reports as turning Rosen into "merely a conduit for other third-party reports, articles, and

---

[34] Dr. Rosen's Report at 19.

[35] *Id*. at 20.

[36] D.I. 177 at 14.

[37] *Id*. at 16.

[38] *Grenier*, 981 A.2d at 529.

[39] D.I. 177 at 16.

investigations ..."[40] An expert witness can however, "rely upon the records of another expert in formulating his own opinion."[41] Regarding Rosen's reliance on Mannen's publications, he primarily uses them to provide context as to why Rosen believes inclined sleepers are dangerous, and how an infant placed in a supine position may be able to roll to their side more easily in an inclined environment.[42]

Rosen applies his own expertise to the facts of this case. His reference to Mannen's report does not serve as merely a recitation of Mannen's findings.[43] Likewise, the study Rosen cites to is from a reputable source and adds context to his determination that A.B. rolled onto his side before dying.[44] Mannen's publications prepared in advance of this litigation are the type of source an expert in pediatric sleep disorders would reasonably rely upon.

**C.** **ROSEN'S OPINION ON THE CHAIN OF EVENTS LEADING TO A.B.'S DEATH FOLLOWS LOGICALLY FROM ROSEN'S CONCLUSIONS AND DOES NOT RENDER HIS OPINION INADMISSIBLE.**

Defendants contend Rosen's opinion as to A.B.'s cause of death "rests on Dr. Rosen's complete guesswork as to what happened on the night of the infant's

---

[40] D.I. 177 at 3.

[41] *Stewart v. Dep't of Servs. For Child., Youth, & their Fams.*, 991 A.2d 750, 758 (Del. 2010).

[42] Dr. Rosen's Report at 19-20.

[43] Dr. Rosen's Report at 19.

[44] Dr. Rosen's Report at 20.

death."[45]  Defendants argue Rosen cannot possibly know what happened in the hours between A.B.'s mother placing him in the RnP and A.B.'s death.[46]   Further, Defendants note Rosen admits he does not know what position A.B. died in.[47]  Defendants assert "simply finding the infant on his side has no medical significance to a causation determination."[48]

Rosen's opinion certainly relies on the facts provided to him regarding A.B.'s position in the RnP when A.B.'s mother went to sleep, and how A.B.'s mother found him in the morning.[49]  He considered those facts in concluding A.B. rolled onto his side before his death.[50]  He also considered the medical examiner's report, including the lividity marks notated by the medical examiner.[51]   Then, Rosen makes an analytical leap in concluding A.B. most likely rolled onto his side based mostly on A.B.'s last known position before his death, the position A.B. was found in, the lividity marks, and the differential diagnosis Rosen performed.[52]

---

[45] D.I. 177 at 3.

[46] *Id*. at 20.

[47] *Id*.

[48] *Id*. at 21.

[49] Dr. Rosen's Report at 23.

[50] *Id*.

[51] *Id*. at 7.

[52] *Id*. at 26.

11

Rosen's approach to determining A.B.'s cause of death relied upon the facts present in this case, his training and experience, and logical deductions that follow reasonably from his earlier conclusions. Thus, the Court finds that Rosen's opinion provides enough logical support for that analytical leap.[53] Accordingly, the Court will permit Rosen to testify and allow any alleged shortcomings in his testimony to be cured by cross examination.

### D. ROSEN'S OPINIONS FORMED USING DIFFERENTIAL DIAGNOSIS METHODOLOGY ARE ADMISSIBLE.

Rosen utilized a differential diagnosis to determine A.B.'s cause of death.[54] Defendants argue Rosen used a flawed methodology and did not "engage in a systematic process of elimination, and he failed to provide a reasoned, scientific explanation rooted in science in the actual facts of the case to rule out each potential cause of death."[55] Defendants also posit Rosen failed to consider several viable, alternative causes of death.[56]

"A differential diagnosis is deemed reliable for *Daubert* purposes if it is rendered after the physician conducts a physical examination, takes a medical

---

[53] *See Minner v. American Mortg. & Guar. Co.*, 791 A.2d 826, 866 (Del. Super. 2000) ("It is not necessary that an expert report have an undisputed foundation, it need only be based on valid reasoning and reliable methodology").

[54] *Id*. at 24-25.

[55] D.I. 177 at 27.

[56] *Id*. at 28-30.

history, reviews clinical tests, including laboratory tests, and excludes obvious (but not all) alternative causes."[57] A doctor does not need to utilize all of those techniques to create a reliable differential diagnosis.[58] "For instance, a physician may reach a reliable differential diagnosis without himself performing a physical examination, particularly if there are other examination results available."[59] This Court must "delve into the particular witness's method of performing a differential diagnosis to determine if his [ ] ultimate conclusions are reliable."[60] "So long as physicians employ objective diagnostic techniques when performing a differential diagnosis, their diagnosis will be reliable under *Daubert* ..."[61] Differential diagnosis can be a difficult method to test for reliability, with variance from case to case, and requires the Court to employ a "flexible" analysis regarding admissibility.[62]

Rosen's differential diagnosis does not go into great detail as to why he rules out each alternative cause of death. He reviewed medical records, witness statements, and the medical examiner's report. Rosen then noted "there was no

---

[57] *State v. McMullen*, 900 A.2d 103, 117 (Del. Super. 2006).

[58] *Id*.

[59] *Id*. (internal quotations omitted) (quoting *Kannakeril v. Terminix Intern., Inc.*, 128 F.3d 802, 807 (3d Cir. 1997)).

[60] *Id*. (internal quotations omitted) (quoting *Poust v. Huntleigh Healthcare*, 998 F.Supp. 478, 496 (D.N.J. 1998)).

[61] *Id*. at 117-18.

[62] *Id*. at 118.

evidence" for many of the alternative causes of death he considered.[63]  Defendants argue Rosen's simple conclusion that no evidence supported those potential causes of death does not provide enough scientific support.[64]  Defendants do not suggest evidence exists to support those alternative theories, but rather contend Rosen needed to provide an expanded explanation as to why he found no evidence to support those theories.

The Court's analysis of Rosen's differential diagnosis requires the Court to decide if Rosen employed a reliable and objective methodology to ruling out potential causes of death.[65]  If a doctor finds no evidence of something, it remains unclear how exactly they could expand upon that finding.  Rosen explains where he would have seen evidence of each alternative cause of death, and then concludes no such evidence exists.[66]  Under the guidance from Delaware law encouraging the Court to take a flexible approach in determining the admissibility of a differential diagnosis,[67] Defendants have not raised sufficient concerns to justify excluding Rosen's differential diagnosis based on his methodology.

---

[63] Dr. Rosen's Report at 24-25.

[64] D.I. 177 at 27.

[65] *McMullen*, 900 A.2d at 117.

[66] Dr. Rosen's Report at 24-25.

[67] *Id*.

As to Rosen's failure to rule out several potential causes of death, several of the potential causes Defendants posit Rosen failed to consider appear to be addressed by Rosen. Defendants assert Rosen failed to consider overheating, Sudden Infant Death Syndrome ("SIDS"), and A.B.'s unique risk factors based on his prematurity and document medical conditions.[68] Rosen explained in his deposition that a SIDS diagnosis results from an inability to find another plausible explanation.[69] It follows logically that as Rosen concluded A.B. died from asphyxiation, he necessarily would rule out SIDS because asphyxiation stood as a cause of death Rosen could not exclude.

Rosen also examined A.B.'s medical history and considered several of A.B.'s medical conditions as part of his differential diagnosis.[70] Rosen noted "[A.B.] was in his usual state of health in the 24 hours preceding his death."[71] Defendants' contention that Rosen did not consider A.B.'s medical conditions appears to be incorrect.

Although Rosen did not consider overheating as a potential cause of death, in his deposition, he explained he saw no evidence to support a theory based on

---

[68] D.I. 177 at 28.

[69] D.I. 205 Pls. Ex. I at 161-62 ("Dr. Rosen's Deposition").

[70] Dr. Rosen's Report at 24-25.

[71] *Id*. at 22.

15

overheating.[72] "A differential diagnosis is deemed reliable for *Daubert* purposes if it ... excludes *obvious* (but not all) alternative causes."[73] Thus, the Court must consider whether overheating rates as an obvious alternative cause of death in this case. Rosen found "no evidence of autonomic dysfunction," noted the temperature of the room registered around 70 degrees Fahrenheit, and found that A.B. was dressed appropriately for that temperature.[74] The Court finds Rosen's explanation to be supported by the facts and grounded in logic.

Because the Court's analysis under *Daubert* leans toward admissibility if the information may assist the trier of fact, Rosen's differential diagnosis is admissible.

### E. ROSEN CANNOT RELY ON INCREASED RISK OF HARM TO ESTABLISH CAUSATION.[75]

Defendants' final challenge to Rosen's report centers on Rosen's determination that the RnP's design increases the risk of infant death.[76] Rosen discusses the increased risk associated with inclined sleepers at length within his report.[77] Defendants argue Rosen's discussion of increased risk renders his opinion

---

[72] Dr. Rosen's Deposition at 268.

[73] *McMullen*, 900 A.2d at 117 (emphasis in original).

[74] Dr. Rosen's Deposition at 268.

[75] This analysis is almost identical to the analysis in the Memorandum Opinion and Order discussing the admissibility of Hoffman's testimony. The key difference is that Rosen does not otherwise conclude the RnP *caused* A.B.'s death.

[76] D.I. 177 at 24.

[77] Dr. Rosen's Report at 16-22.

inadmissible because Pennsylvania courts do not allow testimony regarding increased risk causation in products liability cases.[78]

Pennsylvania law does not permit the use of "increased risk" testimony to establish causation in products liability cases.[79] At oral argument, Plaintiffs acknowledged that increased risk standing alone does not equal causation under Pennsylvania law because the jury must later decide whether the increased risk was a substantial factor in achieving causation.[80] After extensive argument, Defendants conceded their position with Plaintiffs as they "understood counsel to be acknowledging that they were not trying to substitute increased risk for proof of causation."[81]

---

[78] D.I. 177 at 24.

[79] *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 227 F. Supp. 3d 452, 487 n. 28 (D.S.C. 2017), *aff'd sub nom. In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.* (No II) MDL 2502, 892 F.3d 624 (4th Cir. 2018); *see also Lempke v. Gen. Elec. Co.*, 2012 WL 94547 at *4 (W.D. Pa. Jan. 11, 2012) (finding increased risk as causation only applied to situations where the defendant has a duty to perform an act, or where defendant undertook an obligation to perform an act).

[80] Pls' Suppl. Br. at 12; Tr., Oral Argument, C.A. No. N20C-01-067 PAW at 102:23-104:4. Plaintiffs further clarify that "[t]his increased risk argument is really an argument to the point of what will the jury instructions look like and what will the arguments look like to the jury, but it is absolutely a proper basis by which causation can be proved." *Id.* at 107:13-19.

[81] Tr., Oral Argument, C.A. No. N20C-01-067 PAW, at 147:7-15.

17

Here, Rosen's report does opine as to the increased risk caused by the RnP[82] and determines A.B. died from asphyxiation.[83]  However, Rosen's report does not appear to opine that the RnP caused A.B.'s death.  Moreover, Defendants have conceded that Plaintiffs are not attempting to substitute increased risk for causation.  Accordingly, Rosen may not testify that increased risk establishes causation.

## IV.    CONCLUSION

Rosen utilized an admissible differential diagnosis to determine A.B.'s cause of death.  Defendants' contention that Rosen failed to consider alternative causes of death is unpersuasive.  Rosen's opinion does not require expertise in biomechanics or forensic pathology.  He relies on reputable and reliable sources, and his qualifications as a pediatric pulmonologist are unchallenged.

For these reasons, the Court will allow Rosen to testify as an expert witness. He may not opine as to any increased risk establishing causation.

**IT IS SO ORDERED.**

*/s/ Patricia A. Winston*
**Patricia A. Winston, Judge**

---

[82] Dr. Rosen's Report at 16-22.

[83] *Id*. at 26.