## IN THE SUPREME COURT OF THE STATE OF DELAWARE

CARTER RALSTON,        §
       §    No. 449, 2022

       Respondent Below,        §
       Appellant,        §    Court Below:  Family Court
       §    of the State of Delaware
       v.        §
       §    File No.       22-06-08TN
DIVISION OF SERVICES FOR        §    Petition No.  22-11940
CHILDREN, YOUTH AND THEIR        §
FAMILIES ("DSCYF"),        §    In the Interest of:
       §    Lanie Ralston (D.O.B. 3/27/21)
       Petitioner Below,        §
       Appellee.        §

Submitted:   August 9, 2023
Decided:     October 24, 2023

Before **SEITZ**, Chief Justice; **TRAYNOR** and **LEGROW**, Justices.

Upon appeal from the Family Court.  **AFFIRMED**.

George R. Tsakataras, Esquire, THE LAW OFFICE OF GEORGE R. TSAKATARAS, P.A., Wilmington, Delaware, *for Appellant Carter Ralston*.

Michelle R. Skoranski, Esquire, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee Department of Services for Children, Youth and Their Families*.

Alfred A. Cave, III, Esquire, OFFICE OF THE CHILD ADVOCATE, Wilmington, Delaware, *for Lanie Ralston*.

**LEGROW**, Justice:

The Family Court terminated Carter Ralston's parental rights in his daughter who, at the time, had been in the State's custody for over a year. The court's decision was based primarily on Mr. Ralston's failure to make progress on a case plan established by the Department of Services for Children, Youth, and Their Families (the "Department"), the State agency charged with, among other things, serving dependent and neglected children. Mr. Ralston was incarcerated throughout most of the proceedings below, but the case plan aimed to reunify him with his daughter. After the court terminated his parental rights, Mr. Ralston moved for relief from the order on the grounds that, since the order's issuance, he had been released from prison and had completed the requirements of his case plan. The Family Court denied that motion, concluding that evidence of Mr. Ralston's post-termination compliance with the case plan did not constitute "newly discovered evidence" under Family Court Civil Rule 60.

Mr. Ralston raises four issues on appeal from the Family Court's decisions. *First*, he argues that the Family Court violated his due process rights by not considering a family member's petition for guardianship before terminating his parental rights. *Second*, Mr. Ralston contends that the Family Court abused its discretion by concluding that the Department made reasonable efforts to reunify the family. *Third*, he asserts that the Family Court did not consider the child's relationship with her siblings when evaluating her best interests under

13 *Del. C.* § 722(a). *Fourth*, Mr. Ralston maintains that the Family Court abused its discretion by denying the post-termination motion.

Having considered each of Mr. Ralston's arguments, we have concluded that the Family Court's decision should be affirmed. Although disposing of the guardianship petition before terminating Mr. Ralston's parental rights would have been the better practice, the procedural sequence was not so deficient that it violated Mr. Ralston's due process rights. As to the remaining issues, the Family Court correctly applied the law and did not abuse its discretion.

## I.      RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Lanie Ralston (the "Child") was born prematurely on March 27, 2021.[1] Mr. Ralston ("Father") and the Child's biological mother ("Mother")[2] have been romantically involved for 14 years and share one other child who is not in their custody.[3] Both parents have histories of substance abuse and mental health challenges.[4] They each have extensive criminal histories and had pending charges at the time of the hearing on the Department's Petition for the Termination and Transfer of Parental Rights (the "TPR Petition").[5]

---

[1] Opening Br. Ex. A ("TPR Order") at 8.
[2] The Family Court also terminated Mother's parental rights in the Child, which are not at issue in this appeal. Mother has separately appealed. *See Briggs v. Dep't of Servs. for Child., Youth & Their Fams.*, No. 446, 2022.
[3] TPR Order at 7–8. Mother has a third child who is not related to Father. *Id.* at 7.
[4] *Id.* at 10–12, 15–16.
[5] *Id.* at 17–18.

Mother and Father were represented by separate counsel throughout the proceedings below. An attorney from the Office of the Child Advocate ("OCA") represented the Child.[6]

## A. The Child's Birth and Foster Placement

Mother and the Child both tested positive for fentanyl upon the Child's birth.[7] The Child remained in Christiana Hospital for more than a month thereafter, having experienced withdrawal and seizure-like symptoms after she was born.[8]

The Department received information about the Child's purported prenatal substance exposure on March 28, 2021, and began working with the Child's parents to identify potential safety resources with whom the Child could be placed.[9] After considering and ruling out three family members identified by the parents,[10] the Department approved Danielle Murphy, a non-relative suggested by Mother, as a safety-plan placement.[11] The Child was discharged from the hospital to Murphy on April 30, 2021, under an out-of-home safety agreement that required Murphy to supervise all contact between the Child and her parents.[12]

---

[6] Am. App. to OCA's Answering Br. at C2.
[7] TPR Order at 8. Mother also tested positive for cocaine. *Id.*
[8] *Id.*
[9] *Id.* at 8–9.
[10] *Id.*
[11] *Id.* at 9.
[12] *Id.* at 8–9.

3

On or about May 21, 2021, Murphy brought the Child to Nemours Children's Hospital after the Child began foaming at the mouth and exhibiting seizure-like symptoms.[13] The Child had attended a primary-care-physician appointment with Mother and Murphy earlier that day.[14] Mother, who had tested positive for fentanyl and other drugs 10 days earlier, held and kissed the Child throughout the appointment.[15] While at Nemours, the Child underwent testing, and on June 1, 2021, the test results returned positive for fentanyl.[16] The Department filed a police report that day.

On June 2, 2021, the Family Court granted the Department's application for an *ex parte* custody order,[17] and the Department removed the Child from Murphy's care while police conducted a criminal investigation into the Child's fentanyl exposure. The Child was placed with a Department-approved foster family with whom she remained throughout the proceedings.[18] On June 8, 2021, the court held a Preliminary Protective Hearing, which Mother and Father attended.[19] On June 15, 2021, the court issued a Preliminary Protective Hearing Order, finding, among other things, that: (i) probable cause existed to believe the Child was

---

[13] *Id.* at 9.
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *See* Am. App. to OCA's Answering Br. at C1–2.
[18] TPR Order at 9, 19.
[19] *Id.*; *see* App. to Opening Br. at A455–59.

4

dependent under 10 *Del. C.* § 901(8);[20] (ii) it was in the Child's best interests to remain in the Department's custody;[21] and (iii) the Department exercised reasonable efforts "to prevent the unnecessary removal of [the] Child from the home," "to reunify" the family, and "to notify adult grandparents and other adult relatives within 30 days that [the] Child has been placed into care."[22] The Preliminary Protective Hearing Order prohibited physical contact between the Child and the parents but allowed virtual visitation.[23]

The court held five hearings over the next year. Throughout those proceedings, the court made findings that: (i) the Child was dependent under 10 *Del. C.* § 901(8) or neglected under 10 *Del. C.* § 901(18);[24] (ii) the Department exercised due diligence to identify and provide notice to all adult relatives, including those identified by the parents;[25] and (iii) the Department made reasonable efforts to prevent the unnecessary removal of the Child from the home[26] and to finalize the

---

[20] App. to Opening Br. at A455.
[21] *Id.* at A456.
[22] *Id.*
[23] *Id.* at A458.
[24] *Id.* at A460 (Adjudicatory Hearing Order); *id.* at A463 (Dispositional Hearing Order); *id.* at A467 (Review Hearing Order); *id.* at A471 (Review Hearing Order); *id.* at A476 (Permanency Hearing Order).
[25] *Id.* at A461 (Adjudicatory Hearing Order); *id.* at A465 (Dispositional Hearing Order); *id.* at A468 (Review Hearing Order); *id.* at A472 (Review Hearing Order); *id.* at A477 (Permanency Hearing Order).
[26] *Id.* at A461 (Adjudicatory Hearing Order); *id.* at A464 (Dispositional Hearing Order).

operative permanency plan.[27]  The permanency plan in effect throughout most of that year was reunification of the Child with Father and Mother.

## B.   Father's Incarceration and Case Plan

Father was incarcerated in August 2021.[28]  On October 1, 2021, the court held a Dispositional Hearing, during which the parties presented evidence.[29]  At the hearing, Father testified that he would be released on October 15, 2021.[30]

By the time of the Dispositional Hearing, the Department had established a case plan for Mother that enumerated five steps for reunification.[31]  The Department had not established a case plan for Father, even though the court had previously directed it to establish case plans for both parents by September 24, 2021.[32]  The record, although unclear, suggests that Father's incarceration delayed the Department's development of a case plan.[33]  The Department intended to establish Father's case plan after his release[34] based on Father's previous representations that he would be released on October 15, 2021.

---

[27] *Id.* at A468 (Review Hearing Order); *id.* at A473 (Review Hearing Order); *id.* at A478 (Permanency Hearing Order).
[28] TPR Order at 15.
[29] *Id.* at 3; App. to Opening Br. at A463.
[30] App. to Opening Br. at A464.
[31] *Id.* at A465.
[32] *Id.* at A461–62 (emphasis omitted).
[33] *See* TPR Order at 3.  The court issued the Adjudicatory Hearing Order directing the Department to establish case plans for both parents on August 4, 2021.  *See* App. to Opening Br. at A462. Father was incarcerated that month.
[34] *Id.* at A464.

The court held a Review Hearing on November 23, 2021, and issued a Review Hearing Order on November 24, 2021 (the "First Review Hearing Order"). The First Review Hearing Order noted that, despite Father's testimony at the Dispositional Hearing, "a DELJIS search revealed that Father's release date is August 23, 2023."[35] Accordingly, the court ordered the Department to establish a case plan for Father "enumerating necessary steps for reunification, notwithstanding his incarcerated status."[36]

The Department established a case plan for Father at some point before the next Review Hearing held on February 18, 2022.[37] The case plan had the goal of reunification and required Father to: (1) complete a mental health evaluation and follow any recommended treatment; (2) complete a substance abuse evaluation and follow any recommended treatment; (3) complete a parenting class, exhibit appropriate parenting behaviors, and provide the Department with a certificate of completion (the "Parenting Requirement"); (4) obtain and maintain consistent legal employment (the "Employment Requirement"); and (5) secure and maintain stable housing (the "Housing Requirement").[38] On February 24, 2022, the court issued a second Review Hearing Order, noting that the Department had reported that "Father

[35] *Id.* at A468. The acronym "DELJIS" stands for the Delaware Criminal Justice Information System.
[36] *Id.* at A469.
[37] *See id.* at A474.
[38] TPR Order at 15.

7

reached out and expressed interest in making progress toward his case plan goals while incarcerated."[39] The court also found that the "services provided in the case plan constitute reasonable efforts toward reunification of the child and her parents."[40] But the court noted that the Department worker assigned to the case testified at the Second Review Hearing that a "meeting with the Permanency Planning Committee to discuss a goal change will take place in the near future."[41]

## C. The Department Moves to Modify the Permanency Plan, and Francis Petitions for Guardianship

The Department moved to modify the permanency plan from reunification to termination of parental rights ("TPR") and adoption on March 11, 2022.[42] According to the Department, its efforts to reunify the Child with her parents had proved unsuccessful, and it had determined that reunification no longer was practicable.[43] The Child's attorney filed a response supporting the proposed goal change, and the court granted the motion on March 25, 2022.[44]

On or around April 24, 2022, Nicole Francis, the Child's first cousin twice removed,[45] filed a petition for guardianship. Francis testified at the hearing on the

---

[39] App. to Opening Br. at A471.
[40] *Id.* at A473.
[41] *Id.*
[42] TPR Order at 4–5.
[43] *Id.*
[44] *Id.* at 5.
[45] Francis testified that her mother and the Child's maternal grandfather are sisters. *See* App. to Opening Br. at A263.

TPR Petition (the "TPR Hearing") that she originally learned that the Department had custody of the Child when the Child was three months old, but she believed the Child had been returned to the parents sometime after that.[46] According to Francis, she did not learn that the Child was placed with a foster family until April 2022.[47] Francis further testified that she advised the Department of her guardianship petition after she filed and that the Department told Francis that temporary guardianship did not comport with its new goal—adoption.[48]

The court held a Permanency Hearing on May 10, 2022, and issued a Permanency Hearing Order on May 12, 2022.[49] The court acknowledged Francis's guardianship petition but noted that the Department "indicated that a more permanent option would be preferable."[50] The court also found that the Department had made reasonable efforts to finalize the permanency plan in effect, which was now TPR and adoption.[51]

## D.    The Court Terminates the Parents' Parental Rights

The Department filed the TPR Petition on June 14, 2022, and the two-day TPR Hearing occurred on September 19, 2022 and October 7, 2022.[52] On

---

[46] *Id.* at A268.
[47] *Id.*
[48] *Id.* at A269–73.
[49] *Id.* at A475–79.
[50] *Id.* at A477.
[51] *Id.* at A478.
[52] TPR Order at 6.

September 23, 2022, Francis filed an amended petition for permanent guardianship, which the Department moved to dismiss for lack of standing on October 12, 2022.[53] The court granted the Department's motion to dismiss on November 1, 2022.[54] Francis did not appeal.

During the TPR Hearing, the parties presented testimony from eight witnesses, including Father, Mother, and Francis.[55] The court took the matter under advisement on October 21, 2022, after providing the parties an opportunity to submit written closing arguments.[56] Father was released from incarceration and placed on probation on October 30, 2022,[57] and the court issued the order terminating Father's parental rights (the "TPR Order") on November 4, 2022.

Several aspects of the TPR Order are pertinent to this appeal. The statutory standard for TPR requires a two-part analysis.[58] "First, there must be proof of an enumerated statutory basis for the termination" under 13 *Del. C.* § 1103(a).[59] "Second, there must be a determination that severing the parental right is in the best interest of the child" under 13 *Del. C.* § 722.[60] "If the termination of parental rights is based primarily on the parent's failure to plan for the child's needs, [the

---

[53] *Id.*
[54] *Id.*
[55] *Id.* at 2.
[56] *Id.* at 6–7.
[57] *Id.* at 22.
[58] *See Div. of Fam. Servs. v. Hutton*, 765 A.2d 1267, 1271 (Del. 2001).
[59] *Id.* (quoting *Shepherd v. Clemens*, 752 A.2d 533, 537 (Del. 2000)).
[60] *Id.* (quoting *Shepherd*, 752 A.2d at 537).

Department] must prove by clear and convincing evidence that it 'made *bona fide* reasonable efforts to reunite the family.'"[61]

With respect to Section 1103(a), the court found that the Department established by clear and convincing evidence that Father failed to plan adequately for the Child under 13 *Del. C.* § 1103(a)(5)(a) and 13 *Del. C.* § 1103(a)(5)(b).[62] Father's failure to complete his case plan formed the primary basis for this conclusion, but the court also noted that Father was incarcerated from August 2021 through the TPR Hearing for drug charges.[63] Regarding the case plan, the court found that Father failed to complete the Parenting Requirement,[64] the Employment Requirement,[65] and the Housing Requirement[66] before the TPR Hearing. Father does not dispute those findings on appeal.

The court also found, based on its consideration of the best-interest factors enumerated in 13 *Del. C.* § 722(a), that TPR was in the Child's best interests.[67] Father does not dispute the court's findings with respect to the best-interest factors

---

[61] *Brown v. Div. of Fam. Servs.*, 14 A.3d 524, 532 (Del. 2011) (quoting *Stewart v. Dep't of Servs. for Child., Youth & Their Fams.*, 991 A.2d 750, 758 (Del. 2010)).
[62] TPR Order at 22.
[63] *Id.*
[64] *See id.* at 16–17, 22.
[65] *See id.* at 17, 22.
[66] *See id.*
[67] *Id.* at 27–32.

but instead asserts that the court erred by not expressly considering the Child's relationship with her siblings when weighing two of the factors.[68]

Finally, the court found that the Department had made reasonable efforts to reunify the family.[69] The court noted that the Department had provided both Mother and Father with appropriate case plans for reunification and offered appropriate services to both parents.[70] The court held that the Department "timely and appropriately" moved to change the goal from reunification to TPR and adoption "when it appeared that the parents were not going [to] successfully complete their respective Case Plans in a timely manner."[71] The court also found that the Department sought and obtained from the parents the names of family and friends who might be suitable placement options for the Child and explored each of them.[72] The TPR Order identifies each individual that the Department considered and the reasons why the Department concluded they were not suitable placement options.[73]

E. The Motion for Reargument

Father filed a motion for relief from the TPR Order (the "Motion for Reargument") on November 21, 2022. Father claimed that he had completed his case plan since being released from incarceration and argued that he should be

---

[68] Opening Br. at 39–41.
[69] TPR Order at 23–27.
[70] *Id.* at 26–27.
[71] *Id.* at 27.
[72] *Id.* at 23–26.
[73] *Id.*

12

permitted to present evidence to that effect.[74] On December 19, 2022, the court issued an order denying the Motion for Reargument (the "Reargument Order"), concluding that there was not a sufficient basis for the relief requested because evidence of Father's post-TPR Hearing completion of the case plan did not constitute "newly discovered evidence" under Family Court Civil Rule 60.[75]

## II.    STANDARD OF REVIEW

"When reviewing the decision of the Family Court to terminate parental rights, this Court conducts a 'review of the facts and law, as well as the inferences and deductions made by the trial court.'"[76] Legal conclusions are reviewed *de novo*.[77] To the extent the decision relies on factual findings, we review those findings to ensure they are supported by the record and are not "clearly wrong."[78] "If the Family Court has correctly applied the law, our review is limited to abuse of discretion."[79]

---

[74] Opening Br. Ex. B ("Reargument Order") at 2–3.

[75] *Id.* at 7.

[76] *Brock v. Dep't of Servs. for Child., Youth, & Their Families*, 272 A.3d 781, 787 (Del. 2022) (quoting *Powell v. Dep't. of Servs. for Child., Youth & Their Families*, 963 A.2d 724, 730 (Del. 2008)).

[77] *George v. Dep't of Servs. for Child., Youth & Their Families*, 150 A.3d 768, 2016 WL 6302525, at *4 (Del. Oct. 27, 2016) (TABLE).

[78] *Bower v. Dep't of Servs. for Child., Youth & Their Families*, 142 A.3d 505, 2016 WL 3382353, at *4 (Del. June 9, 2016) (TABLE).

[79] *Id.*

## III. ANALYSIS

### A. The Family Court did not violate Father's due process rights.

Father contends that the Family Court violated his constitutional right to due process by refusing to hear Francis's guardianship petition before deciding the TPR Petition.[80]  The Department and OCA contend that Father's argument is a veiled attempt to challenge the Family Court's denial of Francis's petition and that Father lacks standing to do so on appeal.[81]  "This Court reviews constitutional claims *de novo*."[82]

#### 1. Father has standing to assert this claim on appeal.

Standing is a threshold issue that a court must affirmatively consider; litigation pending before the court must involve a "case or controversy" appropriate for the exercise of judicial power.[83]  "To establish standing, a plaintiff or petitioner must demonstrate first, that he or she sustained an 'injury-in-fact'; and second, that the interests he or she seeks to be protected are within the zone of interests to be protected."[84]

---

[80] *See* Opening Br. at 20–24; Reply Br. at 1–7.
[81] *See* Department's Answering Br. at 15; OCA's Answering Br. at 16.
[82] *Sampson v. Div. of Fam. Servs.*, 868 A.2d 832, 835 (Del. 2005).
[83] *George*, 2016 WL 6302525, at *2 (quoting *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003)).
[84] *Id.* (quoting *Dover Hist. Soc'y*, 838 A.2d at 1110).

In *George v. Department of Services for Children, Youth & Their Families*,[85] this Court addressed standing arguments similar to those raised in this case.[86] Like Father, the appellant in *George* argued that the Family Court violated her due process rights by stating it "would not decide" a petition for guardianship, thereby precluding the appellant "from introducing evidence in favor of the Guardianship Petition that would have made the court less likely to grant the TPR."[87] This Court recognized the appellant's standing to assert that due process claim in *George*. First, we reasoned that the order challenged on appeal terminated the appellant's rights and therefore "caused her injury-in-fact."[88] Second, we explained, the appellant's "interest in maintaining a parental relationship with the [children] [was] within the zone of interests to be protected."[89]

*George* guides the standing analysis here. Father argues that the court's refusal to hear Francis's guardianship petition before deciding the TPR Petition barred him from introducing evidence showing guardianship was preferable to TPR, thereby stripping him of the Constitution's procedural protections.[90] The operative notice of appeal designates the TPR Order and the Reargument Order as the orders

---

[85] 150 A.3d 768, 2016 WL 6302525 (Del. Oct. 27, 2016) (TABLE).
[86] *See id.* at *2 ("DFS and the CASA argue that George's first argument is a veiled attempt to appeal the Family Court's denial of the Guardianship Petition, and that George does not have standing to do so.").
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *See* Opening Br. at 22–23; Reply Br. at 1–2.

from which he appeals.[91]  The TPR Order terminated Father's parental rights and therefore caused his injury-in-fact.[92]  And Father's "interest in maintaining a parental relationship with the [Child] is within the zone of interests to be protected."[93]  Accordingly, Father has standing to challenge the court's decision not to consider Francis's petition before issuing the TPR Order.

2. **Application of the *Eldridge* factors shows there was no deprivation without due process.**

"In a 'termination of parental rights proceeding, [this Court] analyzes . . . due process standards in accordance with the factors established by the United States Supreme Court in *Mathews v. Eldridge.*'"[94]  "Those factors are 'first, the private interests at stake; second, the government's interests; and third, the risk that procedures used will lead to an erroneous result.'"[95]  This Court has noted that the "private interest in the parent-child relationship is quite powerful" and that the risk of erroneous deprivation in a TPR proceeding can be "considerable."[96]  When seeking TPR, the government's interests are "the welfare of children and . . . fostering an accurate decision."[97]

---

[91] *See* Am. Notice of Appeal at 2.
[92] *See George*, 2016 WL 6302525, at *2.
[93] *Id.*
[94] *Orville v. Div. of Fam. Servs.*, 759 A.2d 595, 598 (Del. 2000).
[95] *George*, 2016 WL 6302525, at *3 (quoting *Hughes v. Div. of Fam. Servs.*, 836 A.2d 498, 508 (Del. 2003)); *see Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).
[96] *George*, 2016 WL 6302525, at *3 (quoting *In re Burns*, 519 A.2d 638, 646 (Del. 1986)).
[97] *Id.* (quoting *Hughes*, 836 A.2d at 508).

16

Although it would have been preferable for the Family Court to hear and resolve Francis's petition before issuing the TPR Order, the proceedings adequately protected Father against the risk of an erroneous deprivation of his parental rights. As an initial matter, the Department bore the burden of demonstrating, by clear and convincing evidence, that TPR and adoption were in the Child's best interests.[98] The record supports the Family Court's finding that the Department met its burden, notwithstanding Father's challenges to that conclusion, which are discussed below.[99] In addition, Father was given the opportunity to present relevant evidence at the TPR Hearing, including evidence relating to Francis's willingness and suitability to serve as a guardian. In fact, Mother introduced testimony from Francis that bore on several

---

[98] *See* TPR Order at 32 ("Therefore, the Court finds [the Department] established by clear and convincing evidence under 13 *Del. C.* § 722 that it is in [the Child's] best interest to terminate [Mother's] and [Father's] parental rights.").
[99] *See infra* Part III.C.

of the best-interest factors,[100] and counsel for Father cross-examined Francis.[101] The procedures employed were constitutionally adequate.

To be sure, resolving Francis's guardianship petition before or contemporaneously with disposition of the TPR Petition would have been better practice. But Francis did not even seek temporary guardianship of the Child until after the court granted the Department's motion to modify the permanency plan and

---

[100] The best-interest factors enumerated in 13 *Del. C.* § 722(a) are:

(1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;
(2) The wishes of the child as to his or her custodian or custodians and residential arrangements;
(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;
(4) The child's adjustment to his or her home, school and community;
(5) The mental and physical health of all individuals involved;
(6) Past and present compliance by both parents with their rights and responsibilities to their child under [13 *Del. C.* § 701];
(7) Evidence of domestic violence as provided for in Chapter 7A of [title 13 of the Delaware Code]; and
(8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense.

13 *Del. C.* § 722(a). During Mother's direct examination of Francis, Francis provided testimony about her home, including its occupants (App. to Opening Br. at A264); her criminal history (*id.* at A264–65); her and her husband's salaries (*id.* at A266); the Child's opportunities to interact with Francis's grandchildren if the Child resided with Francis (*id.* at A267); Francis's previous interactions with the Child (*id.* at A276–77); and Francis's ability to provide the Child with an "appropriate and safe home until [Mother] gets on her feet" (*id.* at A277). On cross-examination by Father, Francis testified that she had raised six children and never had issues with the Department. *See id.* at A285–86. On cross-examination by OCA, Francis testified that neither she nor her husband had mental health concerns that would affect Francis's ability to raise the Child (*id.* at A288–89) and that there had been no incidents of domestic violence in Francis's home (*id.* at A289). Francis also testified that she wanted the court to hear her petition for permanent guardianship. *See id.* at A276.

[101] *See id.* at A285–86.

18

the goal changed to TPR and adoption.[102] The relief sought in Francis's guardianship petition therefore did not comport with the Department's permanency goal when she filed it. Moreover, Francis testified that the Department "asked" Francis to pursue adoption in light of the Department's changed permanency goal and provided her with the contact information for an adoption agency.[103] But Francis ultimately chose not to pursue adoption and instead decided to wait to "see what the judge [said]."[104]

**B.    The Family Court did not abuse its discretion by concluding that the Department made reasonable efforts to reunify the family.**

Father next contends that the Department failed to satisfy its duty to make "reasonable efforts" toward reunification, and that the Family Court erred in concluding otherwise.[105] The Department, Father argues, "has a statutory duty"[106] to make reasonable efforts to (1) reunify the family, and (2) "avoid a non-family placement."[107] According to Father, the Department breached both prongs of its duty by "failing to fully explore" placing the Child with Betsy Rodriguez (the

---

[102] *See* TPR Order at 5. The court granted the Department's motion to change the permanency plan on March 25, 2022. *Id.* Francis filed her guardianship petition on or around April 24, 2022. *See id.*; App. to Opening Br. at A487.

[103] App. to Opening Br. at A272–73.

[104] *Id.* at A274.

[105] *See* Opening Br. at 25–37.

[106] *Id.* at 26.

[107] *Id.* at 28.

Child's paternal grandmother), Nellie Guzman (the Child's paternal aunt), and Nicole Francis (the Child's first cousin twice removed).[108]

Father overstates the Department's duty with respect to placing the Child with a relative. "When seeking termination of parental rights based on a failure to plan, [the Department] must prove that it 'made *bona fide*, reasonable efforts to reunite the family.'"[109] Under the Adoption and Safe Families Act ("ASFA"),[110] the Department must institute a plan that provides that "reasonable efforts shall be made to preserve and reunify families . . . prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home."[111] The plan also must "provide[] that the State shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards."[112] Delaware's statutory mandate governing the Department's

---

[108] *Id.* Father also contends that the Department breached its duty to make reasonable efforts toward reunification because Mother requested, but never received, assistance from a family interventionist. *Id.* at 29. Mother's failure to receive assistance from a family interventionist does not show that the Department failed to exercise reasonable efforts. Mother testified that she initially declined the Department's offer to secure the assistance of a family interventionist but later changed her mind. App. to Opening Br. at A206–07, A240–41. By that time, however, there was a shortage of family interventionists, and Mother was placed on a waiting list. *Id.* at A23–24. The fact that a family interventionist did not assist Mother was a consequence of her refusal to accept the Department's assistance, not of any failure by the Department to exercise reasonable efforts.

[109] *Powell*, 963 A.2d at 737.

[110] The ASFA prescribes requirements that the Department must follow to receive federal funding in connection with certain family and child welfare services.

[111] 42 U.S.C. § 671(a)(15)(B).

[112] *Id.* § 671(a)(19).

reunification obligations[113] requires the Department to provide "reunification services."[114] Father cites these statutes as the bases for the two-pronged duty he ascribes to the Department.[115]

Father misstates the Department's duty. Nothing in the text of those statutes, or in the cases Father cites, suggests that the Department has a duty to prioritize placement of the Child with a relative. Under the ASFA, the Department must "consider" giving preference to an adult relative in placement determinations.[116] But nothing in the ASFA states that the Department must make "reasonable efforts . . . to *avoid* a non-family placement."[117] Imposing such a duty on the Department would risk, in at least some cases, pitting the Department's objectives against the child's best interests, which must "remain paramount."[118]

The Department fulfilled its obligation to "consider giving preference to . . . adult relative[s] over a non-related caregiver."[119] Throughout the proceedings, the Family Court made findings on the Department's consideration of each relative identified by the Child's parents, including the three individuals Father names on

---

[113] *See* 29 *Del. C.* § 9003.
[114] *Id.* § 9003(a)(3)(a)(2).
[115] *See* Opening Br. at 26.
[116] 42 U.S.C. § 671(a)(19) ("In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides that the State shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards . . . .").
[117] Opening Br. at 28 (emphasis added).
[118] *In re Burns*, 519 A.2d at 644.
[119] 42 U.S.C. § 671(a)(19).

appeal.[120]  The record shows that the Department provided Rodriguez and Guzman with notice throughout the proceedings and consistently concluded placement of the Child in their care was inconsistent with the Department's policies.[121]  Although the parents did not initially identify Francis as a possible placement option, the Department became aware of her when the Child's grandmother brought Francis to the Department's attention after the Permanency Hearing.[122]  By that point, however, the court had granted the Department's motion to modify the permanency plan to TPR and adoption.  Nevertheless, the Department provided Francis with resources for pursuing adoption, which Francis chose not to utilize.[123]  Based on that record, the court did not abuse its discretion by concluding that the Department fulfilled its obligation to consider placing the Child with relatives.

The Family Court also did not abuse its discretion by concluding that the Department made reasonable efforts to reunify the family.  After the Department gained custody of the Child, the Department developed case plans aimed at

---

[120] App. to Opening Br. at A461 (Adjudicatory Hearing Order); *id.* at A465 (Dispositional Hearing Order); *id.* at A468 (Review Hearing Order); *id.* at A472 (Review Hearing Order); *id.* at A477 (Permanency Hearing Order).  The Department also examined all adult relatives and nonrelatives suggested by the parents.  In addition to Guzman, Rodriguez, and Francis, the Department examined and ruled out as suitable placements four individuals who either expressed interest in serving, or were suggested by the parents, as potential placements for the Child.  *See* TPR Order at 23–25.

[121] *See* App. to Opening Br. at A461 (Adjudicatory Hearing Order); *id.* at A465 (Dispositional Hearing Order); *id.* at A468 (Review Hearing Order); *id.* at A472 (Review Hearing Order); *id.* at A477 (Permanency Hearing Order).

[122] *See id.* at A54–56.

[123] *See id.* at A272–75.

reunifying the Child with both parents.[124]  The Family Court found, and Father does not dispute, that Father did not complete three of the five elements of his case plan before the TPR Hearing.[125]  Although Father's incarceration may have contributed to his noncompliance, he also was dilatory in his efforts to complete the plan.  As the Family Court explained:

> At the instant hearing, Father testified he was attending parenting classes through Community Action Program while incarcerated.  Father reported he attend the class every Monday and his anticipated completion date was in approximately twelve (12) weeks.  As evidenced by Father's current engagement in parenting classes, Father's incarceration status has not hindered Father from completing this element of his Case Plan.  Rather Father did not engage in these services until just prior to the instant hearing and has not completed the class as required by his Case Plan . . . .[126]

In sum, the court did not err in concluding that the Department exercised reasonable efforts toward reunification.

## C.     The Family Court did not err by not specifically addressing the Child's relationship with her siblings.

In TPR proceedings, the Family Court must determine whether termination is in the child's best interests by weighing "all relevant factors," including those set forth in 13 *Del. C.* § 722(a).[127]  Father argues that the Family Court did not adequately consider the third and fifth best-interest factors.  The third factor is the

---

[124] *See* TPR Order at 3–4, 10–17; App. to Opening Br. at A473–74.
[125] TPR Order at 15–17.
[126] *Id.* at 16–17.
[127] *In re Hanks*, 553 A.2d 1171, 1179 (Del. 1989) (quoting 13 *Del. C.* § 722(a)).

23

"interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests."[128]  Father contends that the Family Court "has a duty to consider siblings under the statute" and that the court breached that duty by failing to mention the Child's interaction and interrelationship with her siblings in its analysis.[129]  The fifth factor is the "mental and physical health of all individuals involved."[130]  Father contends that the Family Court did not consider how separating the Child from her siblings would impact their mental health.[131]  Because Section 722(a) requires the Family Court to consider only "*relevant* factors,"[132] the Family Court did not err.

The parties did not present evidence to the court that termination would affect a sibling relationship.  The parties did not present material evidence that the Child had interacted with her siblings in any significant way.  By the time of the TPR Hearing, the Child had spent most of her life separated from her siblings.[133]  The

---

[128] 13 *Del. C.* § 722(a)(3).
[129] Opening Br. at 39–41.
[130] 13 *Del. C.* § 722(a)(5).
[131] Opening Br. at 40–41.  During the TPR Hearing, a Department employee testified that the foster family who offered to adopt the Child did not wish to be identified or have a relationship with the Child's biological family.  App. to Opening Br. at A141.
[132] 13 *Del. C.* § 722(a) (emphasis added).
[133] The Child was 18 months old when the TPR Hearing occurred and had spent 16 of those months in a foster home.  TPR Order at 29.

only evidence of interaction between the Child and her siblings was that the siblings visited the Child a few times after her birth, but their visits then ceased.[134] This evidence, standing alone, does not make the Child's relationship with her siblings a relevant factor for the Family Court's consideration. Accordingly, the court did not abuse its discretion by not specifically addressing the interrelationship between the Child and her siblings.[135]

Father's argument concerning the fifth best-interest factor is similarly unpersuasive. Father does not contend that the Family Court overlooked evidence addressing how TPR and closed adoption would impact the mental health of these particular siblings. Rather, Father argues that the Family Court erred by not considering the *possibility* that separating the siblings through a closed adoption could impact their mental health.[136] The implication is that because separation could negatively impact their mental health, the court should have considered the possibility. Accepting that argument would effectively require the Family Court to consider the mental health of all siblings in all cases, regardless of the circumstances. Nothing in Section 722 requires the trial court to consider hypothetical, possible

---

[134] *See* App. to Opening Br. at A39–40, A104, A137–38, A233–34, A384–85. It appears that the visitations might have discontinued after one sibling ran away from her guardian's home and the other sibling lost interest in visiting the Child. *See id.* at A104, A384–85.

[135] *Bower*, 2016 WL 3382353, at *4 ("The court may give different weight to different factors when balancing the best interest factors. Mother has not shown that the court abused its discretion when it did not specifically address the Children's interrelationship with [their sister] when considering the best interest factor in § 722(a)(3).").

[136] Opening Br. at 40–41; Reply Br. at 13.

mental or physical health consequences about which the parties presented no evidence. Because the parties did not adduce evidence concerning how separating these particular siblings could impact their mental health, the court did not abuse its discretion.

**D.    The Family Court did not abuse its discretion by denying Father's Motion for Reargument.**

Finally, Father contends that the Family Court abused its discretion by denying the Motion for Reargument because he completed his case plan after he was released from incarceration.[137] Father argues that the court should have allowed him to present evidence that he completed the plan.[138] Father's Motion for Reargument sought relief under Family Court Civil Rule 60(b),[139] which provides a procedural mechanism for seeking relief from a final judgment, order, or proceeding.[140]

Father's Motion for Reargument did not assert proper grounds for relief, and the court therefore did not abuse its discretion by denying the motion. Rule 60(b)(2) permits the Family Court to "relieve a party . . . from a final judgment, order, or

---

[137] Opening Br. at 43–44; Reply Br. at 14–15.

[138] *Id.*

[139] Father also sought relief under Rule 59(e), arguing that the Family Court failed to fully consider Francis as a placement option for the Child. Reargument Order at 4, 9–11. The Family Court denied that portion of the motion. *Id.* at 9–11. Father does not challenge that portion of the court's Reargument Order.

[140] Fam. Ct. Civ. R. 60(b). Father's motion and related submissions did not identify the precise provisions of the Rule under which Father sought relief. *See* Reargument Order at 5. Similarly, Father's briefs on appeal do not identify the precise provisions on which Father relies. The Family Court construed the Motion for Reargument as relying on Rule 60(b)(2), which governs motions for relief based on newly discovered evidence. *See id.* On appeal, Father does not argue the Family Court applied the wrong rule.

proceeding" based on "*newly discovered* evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)."[141] Evidence of Father's completion of the case plan did not exist at the time of the TPR Hearing because Father had not yet satisfied each requirement. Accordingly, the evidence he seeks to present "constitutes 'new evidence,' not 'newly discovered evidence.'"[142] Because such evidence does not supply a basis for relief under Rule 60(b)(2),[143] the Family Court did not abuse its discretion by denying the Motion for Reargument.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the TPR Order and the Reargument Order as to Father's parental rights.

---

[141] Fam. Ct. Civ. R. 60(b)(2) (emphasis added).

[142] *Bachtle v. Bachtle*, 494 A.2d 1253, 1256 (Del. 1985).

[143] *Id.* at 1255–56 ("In order for evidence to qualify as 'newly discovered evidence,' it must have been 'in existence and hidden at the time of judgment . . . .'" (quoting *Ryan v. U.S. Lines Co.*, 303 F.2d 430, 434 (2d Cir. 1962))).